**IRVING TRUST COMPANY, Plaintiff,**

v.

**Mariana GOMEZ, et al., Defendants.**

**No. 82 Civ. 3183.**

United States District Court,
S.D. New York.

June 10, 1982.

---

Corbin, Silverman, Sanserverino & Taylor, Elizabeth Taylor, New York City, for plaintiff.

Butler, Fitzgerald & Potter, James M. Davis, New York City, for Bulos defendants.

Frank A. Ortiz, Brooklyn, N.Y., for remaining defendants.

## DECISION OF THE COURT

SAND, District Judge.

The plaintiff Irving Trust Company in this action for fraud, money had and received, conversion and unjust enrichment procured an ex parte order of attachment against the defendants in the Supreme Court of the State of New York, County of New York, on April 23, 1982. Pursuant to New York CPLR Section 6212(a), plaintiff sought an order confirming the attachment. Defendants Daniel Bulos, Carlos Bulos, and Marlene Bulos moved to transfer the action to this court on the basis of diversity of citizenship. The motion to confirm is now presented to this court. In addition, the defendants have moved to vacate the attachments.

For the reasons stated herein, the court confirms the attachments against Mariana Gomez, Aquiles Farias, and the Maximo Gomez P.C. por A, but vacates the attachments against Daniel Bulos, Carlos Bulos, and Marlene Bulos.

The burden of proof with respect to all of these motions is upon the plaintiff. Under NY CPLR Section 6212(a), which governs the granting of a motion to confirm, plaintiff must show: 1) that there is a cause of action and that there is a probability of success on the merits; 2) that there is one or more grounds for attachment; and 3) that the amount demanded from the defendants exceeds all counterclaims known to plaintiff. Section 6223, which governs the granting of a motion to vacate, requires in addition a showing of need for continuing the levy.

In this case the elements other than probability of success on the merits do not pose difficult questions. Since all the individual defendants are nondomiciliaries residing out of state and the defendant corporation is a foreign corporation not licensed to do business in this state, there are grounds for these attachments under Section 6201. Although defendants have asserted that they will bring counterclaims against the plaintiff for damages arising out of its stopping payment on certain checks, these counterclaims will not be considered under Section 6212(a) unless plaintiff does not dispute them but concedes that they are just. See *Shearson Hayden Stone, Inc. v. Scrivener*, 480 F.Supp. 256, 257 (S.D.N.Y.1979); *Burt Printing Co. v. Middle East Media Corp.*, 80 F.R.D. 449 (S.D.N.Y.1978). Since these counterclaims would necessarily be based on contentions that the defendants acted in good faith, plaintiff's allegations of fraud amply show that plaintiff does not concede the proposed counterclaims are just. Plaintiff claims that the levy must be continued in order to ensure that a judgment in its favor will in fact be satisfied. The nature of the allegations if probability of success on the merits is shown and the difficulty plaintiff would have reaching the assets of these foreign domiciliaries demonstrate the need for security in this case.

■ The success of plaintiff's claims on the merits depends upon showing that the defendants acted in bad faith in their involvement in certain foreign currency transactions described in more detail below. Plaintiff, of course, must show intent in order to succeed on the merits of its fraud claim. Since defendants have asserted the defense that they were holders in due course under UCC Section 3–302 as to the other causes of action, plaintiff cannot suc-

ceed on these causes of action either, without reference to defendants' state of mind.

The bad faith that defeats status as a holder in due course was recently described as follows: "Bad faith, then, is obviously something far more extreme than a failure to observe reasonable commercial standards or the standards of a reasonably prudent man. It 'is not mere carelessness. It is nothing less than guilty knowledge or willful ignorance.' *Manufacturers & Traders Trust Company v. Sapowitch,* 296 N.Y. 226, 72 N.E.2d 166 (1947). See also *Hall v. Bank of Blasdell,* 306 N.Y. 336, 118 N.E.2d 464 (1954). The issue essentially is whether the circumstances of which the holder has knowledge 'rise to the level that the failure to inquire reveals a deliberate desire on his part to evade knowledge because of a belief or fear that investigation would disclose a defense arising from the transactions.' *General Investment Corp. v. Angelini,* 58 N.J. 396, 278 A.2d 193, 9 UCC Rep.Serv. 1, (1971). See also *Manufacturers & Traders Trust Company v. Sapowitch,* supra." *Corporacion Venezolana de Fomento v. Vintero Sales Corp.,* 452 F.Supp. 1108, 1119 (S.D.N.Y.1978).

At a hearing commencing June 2, 1982, defendants Aquiles Farias, Mariana Gomez, and Daniel Bulos testified. A representative of the corporation Maximo Gomez P.C. por A, hereafter referred to as Gomep, also testified.

*The Gomez/Farias/Gomep Attachment*

■ Mrs. Gomez testified that she is the president of the corporate defendant Gomep and its active chief operating officer. She owns approximately 20 percent of its stock and family members own an additional 50 percent. The corporation is engaged in the cosmetic and medicine business and has been in existence for over fifty years and enjoys an excellent reputation.

For many years the corporation's American banking affiliation has been with the Royal Bank and Trust Company in New York. Aquiles Farias, her husband's nephew, served as financial consultant to the corporation and in recent years has been an executive employee of Gomep.

Neither Gomep nor Mrs. Gomez ever engaged in foreign currency transactions prior to the events described herein.

Mrs. Gomez testified that she received a telephone call from one Rafael Martinez, who described himself as an engineer. Martinez was not previously known to her. He offered to sell United States dollars to her because, allegedly, he and his associates were acquiring Dominican Republic pesos to further investment projects that they contemplated in that country. Martinez was a resident of the Dominican Republic, as are all of these defendants.

All witnesses testified that there is active trading in the Dominican Republic in United States currency and that this trading is lawful and is not limited to licensed currency exchange houses. A market parallel to the official Central Bank-administered exchange market exists. The official rate is one US dollar for one Dominican Republic peso. The rate on the parallel market fluctuates but is in the range of one dollar for 1.45 pesos.

Mrs. Gomez testified that she met with Mr. Martinez and that they quickly agreed to the following arrangement: Mr. Martinez would cause large sums of money, in the millions of dollars, to be deposited in an account which Mrs. Gomez would open in the Irving Trust Company in New York. When Irving Trust Company confirmed to her that the dollars were available in the New York account, Mrs. Gomez was to buy the dollars at a rate which was between 20 and 25 percent under the going exchange rate.

Mrs. Gomez conducted no investigation of Mr. Martinez. She could give no satisfactory explanation of why he approached her other than her prominence in the community, or why he was willing to sell dollars to her at a rate so much less than the rate offered by the many available and well-known foreign currency exchange houses. She testified that Martinez "suggested" that the account be opened in the Irving Trust Company because his associates had good relations with that bank and that she

did not mention Gomep's long standing banking relationship with Royal Bank. The Royal Bank account was, moreover, a corporate account. Mrs. Gomez and Aquiles Farias, with whom she conferred on the matter, agreed to engage in these transactions as individuals on an equal partner basis.

Mrs. Gomez and Aquiles Farias went to New York, opened an account at the Irving Trust Company in their joint names, and deposited some $3,426 ($2,000 was the minimum required balance). Thereafter, on two occasions, Martinez alerted them that checks were being deposited to that account. They obtained confirmation of this from Irving Trust by telex and paid Martinez for the United States dollars pursuant to their agreement. The first transaction involved $313,530.77, and the second involved $311,659.75.

There was another unconsummated transaction, unconsummated insofar as Gomez, Farias, and Gomep are concerned, involving a million dollar deposit. Martinez advised that such an amount was placed in the Irving Trust account, which Gomez and Farias had opened. Mrs. Gomez testified she was agreeable and quite receptive to engaging in this transaction. Martinez asked that a letter be sent to Irving Trust, alerting the bank to this anticipated deposit. Mrs. Gomez sent such a letter.

The versions of Mrs. Gomez and Aquiles Farias diverge somewhat with respect to what next occurred. Mrs. Gomez testified that Martinez told her that unbeknownst to him his associates had sold the $1,000,000 to Juan Valerio Sanchez, a prominent elected official in the Dominican Republic. Farias testified that Mrs. Gomez and he had shown great reluctance to engage in the $1,000,000 transaction and to write a letter to Irving Trust concerning the anticipated $1,000,000 deposit, and that Martinez had taken that deal elsewhere because Gomez and Farias were too difficult to deal with.

In any event, Gomez and Farias agreed that they caused a telex to be sent on the Gomep telex machine to Irving Trust in the name of Juan Valerio Sanchez, containing his account number and other data supplied by Martinez, requesting confirmation by reply to the Gomep telex by Irving Trust that a $1,000,000 deposit had been made to a Sanchez account. Both Mrs. Gomez and Aquiles Farias testified that Martinez insisted that the telex be sent to demonstrate to them that he in fact had caused a $1,000,000 deposit to be made to the Sanchez account. Both Mrs. Gomez and Farias acknowledged that it was improper to send a telex in the name of a stranger inquiring as to such confidential matters as a bank account balance, but claimed they did this because Martinez insisted.

The Irving Trust Company asserts that deposits referred to above were false and fraudulent. It appears that some as yet unidentified corrupt Irving Trust Company employee by some means caused the accounts to reflect the deposits although in fact no funds were actually received in the accounts. Irving Trust had by this time issued official bank checks and sent telex confirmations based on the false deposits. It thereafter stopped payment on the checks, instituted this action, and obtained the attachments which are the subject of this proceeding.

*Conclusions as to Gomez/Farias/Gomep*

We find that plaintiff has shown probable success on the merits as to these defendants. The transactions Gomez and Farias became involved in were on their face so irregular that their failure to further investigate reveals a deliberate choice to avoid learning the truth. Defendants provided the court with no satisfactory explanation of why they never investigated Martinez, why they thought Martinez would sell dollars at such an excessively unfavorable exchange rate if he could have secured the ordinary rate offered by legitimate foreign exchange dealers, or why the bogus Sanchez telex was sent. Moreover, the minimal explanations that Gomez and Farias did offer lacked credibility.

Because it is likely that these defendants will not be able to show that they became holders in due course and in the light of all the other facts set forth in plaintiff's affidavits, we find that plaintiff has shown

probable success on the merits and confirm the attachments against Gomez and Farias.

As to Gomep, we find that the corporate defendant purchased some of these dollars and would have benefited from the transaction; its credit and reputation were utilized in effecting this scam, and plaintiff's demonstration of entitlement to an attachment extends to the corporate defendant as well.

### The Bulos Attachment

█ Irving Trust also seeks to attach the assets of the foreign currency exchange dealer to whom Gomez/Farias resold the dollars they obtained from Martinez and who purchased from Jose Ares Guzman some $600,000 of the Sanchez deposit. Irving Trust contends that the actions of Bulos indicate that the transactions were not in the normal course of business and that Bulos is at best not a holder in due course.

Bulos claims that he is a victim who relied upon Irving Trust official checks and confirmations, and moves to set aside the attachment of its New York bank account. (Although only $3,584 has been attached in this proceeding, the vigor with which this matter has been pursued is doubtless attributable to the fact that another pending proceeding in Miami has tied up approximately $400,000 of Bulos funds, and the impact which this attachment allegedly has on Bulos's reputation in his financial community, which is essential to the successful conduct of his business as a foreign currency dealer).

Irving Trust attempts to demonstrate Bulos's bad faith with the following contentions: A) the actions of Carlos Bulos in going to New York in connection with the first Gomez/Farias transaction were inconsistent with the financial gains allegedly realized by Bulos on that transaction; B) the desire of Bulos to have a certified check exchanged for an official Irving Trust check and the speed with which the funds were withdrawn from the United States, which Irving Trust claims is indicative of an awareness of irregularity; and C) that Bulos failed to investigate adequately certain of these transactions.

### A. The Carlos Bulos trip to New York

Mrs. Gomez's son first approached Daniel Bulos's son Carlos in connection with the purchase and sale of the 300,000 United States dollars. The sons were friends. Daniel Bulos is a licensed foreign exchange currency dealer, and Carlos also works in his father's business. The testimony of Farias and of Daniel Bulos indicates that Farias and Carlos Bulos went personally to the Irving Trust Company in New York to withdraw the $300,000 which Irving Trust had previously confirmed was on deposit in the Farias/Gomez account.

Irving Trust asserts that it would have been a simple matter to effect a transfer of the funds by wire and that the personal trip to New York by Carlos Bulos renders the Bulos bona fides suspect.

Daniel Bulos testified that after the initial contact between their respective sons, between his son and Mariana Gomez's son, he met with Aquiles Farias, who proposed a sale of $300,000 in US funds to him, gave him his business card, and identified himself as being an associate of Mrs. Gomez.

He knew of Mrs. Gomez's standing in the community and that she was president of a long-established Dominican Republic cosmetic and pharmaceutical concern. There was nothing about the transaction which aroused any suspicion on his part. Unaware that the source of the funds was a foreign currency exchange transaction, Bulos apparently assumed that Gomez and Farias were exchanging funds acquired in the ordinary course of Gomep's business.

According to Daniel Bulos's testimony, his son Carlos was going to New York at this time to pursue negotiations in some unrelated proposed business matter, and it seemed convenient that while there he facilitate the Gomez/Farias transaction. Daniel instructed Carlos prior to his departure to obtain the certified check of Irving Trust payable to Farias, to convert the check into an official Irving Trust Company check, and to deposit the check in the Bulos account at Chase Manhattan in New York.

Carlos Bulos and Aquiles Farias did just that. When a certified check for $300,000 was obtained on the 7th floor of the Irving Trust Company in New York, Carlos telephoned Daniel Bulos, who again instructed him to obtain an official Irving Trust Company check for that amount, and to deposit the funds in the Chase account. This Carlos did.

Of course, the importance of the Carlos Bulos trip to New York depends entirely on the credibility of Daniel Bulos's testimony. If the trip to New York was solely for the purpose of this transaction, Irving Trust's contention that this was an unnecessary and disproportionate expense has persuasiveness. On the other hand, if Carlos was to be in New York in any event, the matter seems innocuous enough (Neither party called Carlos Bulos, who was present, at the proceedings).

We accept the testimony of Daniel Bulos as to this issue. The fact that funds could have been wired or that the transaction could have been otherwise structured to effect a reasonably expeditious transfer of the funds without a personal trip to New York lends credence to the testimony that this transaction was not the sole reason for Carlos Bulos to go to that city. If the transaction were known to be tainted, the Buloses might wish to remove themselves further from it, make their role in the matter less prominent, rather than to have Carlos personally engage in the transaction. There is no evidence which contradicts Daniel Bulos's testimony as to this issue, and as noted, we accept his version of the New York trip.

### B. Request for Certified Check and Speed of Withdrawal.

We find unpersuasive Irving Trust's contentions that there is something untoward in the Bulos desire to exchange a certified check for an official Irving Trust Company check or the speed with which the funds were withdrawn from the United States by Bulos after the official check was deposited in the Chase account. Daniel Bulos testified that he preferred an official bank check to a certified check because he believed that there was less risk that payment of such a check might be stopped.

It is the usual practice for money dealers to turn over currency rapidly. Idle funds produce no income, and the risk of loss as a result of currency fluctuations increases the longer the funds are kept in the foreign currency. We find that nothing that Bulos did with regard to the handling of this transaction indicates any lack of good faith on his part.

### C. Failure to Investigate.

Irving Trust contends that Bulos's failure to investigate Martinez and Jose Ares Guzman reveals bad faith or implicates him in the fraudulent scheme. However, the circumstances do not justify such inferences. Bulos's involvement with Martinez is limited to two transactions. First, on March 26, the same day Carlos Bulos procured the official check in New York, Daniel Bulos paid 435,000 Dominican pesos to Gomez's sons in exchange for the $300,000 in American currency.

Although the Gomez sons demanded full payment in cash, Bulos for lack of funds paid 184,900 pesos by means of his personal check. Pursuant to Gomez's instructions, he made his check payable to Rafael Martinez. Bulos testified that he had never heard of Martinez.

Bulos's first meeting with Martinez came on March 29, when Martinez presented the check to Bulos for payment. Bulos suggested that they cash it at the bank, but since Martinez preferred direct payment from Bulos, Bulos cashed the check. Bulos testified, and the court agrees, that making the check out to a third party at the request of Gomez is not an unusual transaction that should have moved him to investigate the relationship between Martinez and Gomez, and certainly Bulos's honoring of his own check provides no ground for an assertion that he acted in bad faith.

On the present state of the record, it is more probable than not that Bulos acted in fulfillment of his obligations to Gomez and

that he performed a service for her in making the check payable to a third party, without considering the nature of Gomez's relationship with Martinez. It is not evidence of actual knowledge or willful ignorance that Bulos, a foreign currency dealer, did not concern himself with Martinez's reputation since the payee's name does not affect the validity of the check. Bulos's only real concern would be that in making the check out to a third party he was paying Gomez the amount he owed her, and his conversation with her apparently assured him that this was the case.

The second transaction involved the sale of a second check by Gomez to Bulos. Bulos received a phone call from Gomez, who offered to sell him a check for $13,531.77. Bulos testified that when one of Gomez's sons presented the check to his office, he approved it for payment because he saw that it was Gomez's check, but that he did not notice that the check was made payable to Rafael Martinez rather than to him. (He testified that he only became aware that the payee was Rafael Martinez when the check was shown to him at trial.) When he later discovered that he was not the payee, he asked that Gomez substitute a check payable to him, which she readily did. Upon the substitution, Bulos returned the Martinez check. Bulos testified that he did not want a third person's name on the check because that third person might stop payment and because his own name on the check increased its value.

We find on the present record that an innocent interpretation of these actions is at least as reasonable as the interpretation that Bulos acted in bad faith.

Likewise, the dealings with Jose Ares Guzman do not indicate that Bulos acted wrongfully. Bulos testified that on April 12 Guzman offered to sell him six official Irving Trust checks, each in the amount of $100,000 and payable to Juan Valerio Sanchez. Bulos testified that Guzman offered these checks to him and that he undertook an investigation before committing to purchase them.

He telephoned the payee, Sanchez, known to him to be an elected official of the Dominican Republic and a person engaged in various business activities. Sanchez confirmed to him that the checks had been issued to him and that he had sold them to Guzman. Bulos took the checks to another exchange house, Lacinio Pichaldo, and from there in his presence Pichaldo telephoned the Irving Trust Company in New York, which confirmed that the checks were in order.

Bulos offered the checks for sale to Pichaldo, who agreed to buy them. Bulos then advised Guzman that he would buy the checks, and paid for them in part by funds he had already received from Pichaldo. Bulos made no further investigation, relying on Sanchez's reputation and the Irving Trust's confirmation. He did not inquire into the source of Sanchez's funds and he testified that it was not his usual practice as a foreign exchange dealer to do so.

Bulos's contention that he acted in the ordinary course of business seems plausible. Nothing about this transaction or the anticipated profit should have aroused his suspicion to the extent that failure to investigate constituted willful ignorance. Plaintiff has never shown Bulos knew Sanchez had any connection to the Gomez/Farias transaction or even that Bulos knew at this time that that transaction was tainted. Apparently the only connection between the two transactions that plaintiff has demonstrated to be within Bulos's knowledge is that both transactions involved official Irving Trust Company checks. We cannot find Bulos in bad faith solely on the basis of that knowledge.

We therefore find that Irving Trust has failed to meet its burden of showing probable cause on the merits as to Daniel Bulos, Carlos Bulos, or Marlene Bulos, although we do emphasize that this ruling rests entirely on the present record and precedes the completion of the investigation of this matter.

We note as well that the equities favor resolution of these motions in favor of the Buloses. First, Irving Trust itself has a

high degree of responsibility for what has occurred. It is, after all, the corruption of some employee at the Irving Trust Company placed in a sensitive position which has enabled the fraud to occur. Second, the consequences of this attachment to Bulos are significant. He testified that prior to the proceeding his reputation in Santo Domingo's financial community was such that a check which he signed was worth 1 to 2 percent more than its value would have been without his signature. He is now compelled to buy money at high interest to operate his business with substantially impaired capital, and has pledged his home as security to a claimant against him resulting from Irving Trust's stoppage of payment of checks which he then sold.

We therefore vacate the attachment with respect to the Bulos defendants.

Settle the order on notice.