**MERRILL LYNCH FUTURES INC., Plaintiff,**

v.

**Robert KELLY, J. Mark Miller and Rose Villeroel, Defendants.**

**MERRILL LYNCH FUTURES INC., Plaintiff,**

v.

**Clara MORICI and Rose Villeroel, Defendants.**

Nos. 84 Civ. 2406–CSH, 84 Civ. 2485–CSH.

United States District Court, S.D. New York.

May 7, 1984.

As Amended May 14, 1984.

Brown, Wood, Ivey, Mitchell & Petty, New York City, for plaintiff; Joseph G. Riemer, III, Robert M. Roman, A. Robert Pietrzak, New York City, of counsel.

Scoppetta & Seiff, New York City, for defendant Villeroel; Carolyn H. Henneman, Eric A. Seiff, New York City, of counsel.

Butler, Fitzgerald & Potter, New York City, for defendant Kelly; Thomas A. Butler, New York City, of counsel.

Gusrae, Kaplan & Bruno, New York City, for defendant Morici; Martin H. Kaplan, Mark J. Astarita, New York City, of counsel.

Rein, Mound & Cotton, New York City, for defendant Miller; Michael R. Koblenz, James D. Veach, New York City, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge.

The complaints in these two actions allege separate schemes to defraud plaintiff Merrill Lynch Futures Inc. ("MLF"). On April 4, 1984, the Court, pursuant to Rule 64, Fed.R.Civ.P., signed an *ex parte* order in civil action 84 Civ. 2406 attaching assets of defendants Kelly, Miller, and Villeroel and temporarily enjoining their expenditure of certain funds. Two days later a similar order was entered by Hon. Milton Pollack, sitting in Part I, in civil action 84 Civ. 2485 against defendants Morici and Villeroel. The actions were consolidated solely for the purpose of holding hearings on confirmation of the orders of attachment and entry of a preliminary injunction. Following an initial round of arguments, in a Memorandum Opinion and Order of April 17, 1984, I dissolved the temporary restraints, denied the preliminary injunctions, and declared the attachment of Morici's assets to have been improvident because the supporting affidavits were insufficient. Morici's assets remain attached, however, because plaintiff submitted a second, more detailed application for an order of attachment the next day.

Pursuant to plaintiff's motion to confirm the orders of attachment, required by N.Y. C.P.L.R. § 6211, three days of evidentiary

hearings were held at which an MLF investigator testified. In order to expedite decision, the remainder of a substantial amount of testimony was submitted by stipulation. Soon after the last day of evidentiary hearings, defendant Villeroel consented to confirmation of the orders of attachment against her assets. It remains to be decided whether the orders entered against defendants Kelly, Miller, and Morici should be confirmed.

■ To succeed on a motion to confirm an order of attachment, a plaintiff must establish 1) a ground for the attachment, 2) the existence of a cause of action, 3) the probability that it will succeed on the merits, 4) the need for continuing the levy, and 5) the probability that the amount demanded from the defendants exceeds their potential counterclaims. N.Y.C.P.L.R. §§ 6212(a), 6223; *Executive House Realty v. Hagen*, 108 Misc.2d 986, 438 N.Y.S.2d 174, 177 (Sup.Ct.1981); *Irving Trust Co. v. Gomez*, 550 F.Supp. 773, 774 (S.D.N.Y. 1982). The two actions will be discussed separately.

## I.

■ With regard to 84 Civ. 2406, two of the five elements can be quickly considered. In the Memorandum Opinion and Order of April 17, 1984, I considered the issue of a proper ground for attachment and decided that the defendants' residence outside New York provided such a ground under N.Y.C.P.L.R. § 6201(1). Third, the need to ensure that a judgment in its favor will be satisfied provides plaintiff with an adequate reason for requesting continuation of the levy against these out-of-state defendants. *See Irving Trust Co. v. Gomez, supra*, 550 F.Supp. at 774. Although there are currently no counterclaims, defendants have raised questions about the adequacy of the showing of damages. These are discussed below.

The primary issue is whether plaintiff has demonstrated a probability of success on the merits. The bulk of the testimony was presented by Joseph F. Texido, Compliance Director at MLF, who testified to the results of a recent investigation into irregularities in the "error accounts" at MLF. Defendant Villeroel was until recently the manager of the error unit at MLF and as such was apparently in charge of administration of these accounts. Explaining their significance will require a review of basic procedures in commodities trading.

Brokerage houses such as MLF ordinarily trade commodities futures only at the request of their customers. When a customer wishes to initiate a trade, he contacts a MLF account executive at one of its branch offices. The account executive records the order on an "order ticket" and transmits the text of the ticket by wire or phone to the floor of the Commodities Exchange ("Comex"). An identical order ticket is then written up on the Comex floor and carried by runner to the floor brokers in the trading "rings." MLF has several floor brokers in its employ, but from time to time it also employs various independent brokers. The job of the floor broker is to execute the trade at "open outcry"—that is, to locate in the ring another floor broker who wishes to accomplish a corresponding trade. If the MLF broker wishes to trade contracts to purchase futures in a particular commodity, he must find another broker wishing to trade contracts to sell the same futures at a mutually agreeable price. Following consummation, the floor brokers record the trade on their trading cards, documents which indicate the trades executed by individual floor brokers during the trading day, and mark the order tickets. The marked ticket is returned to a clerk on the floor who reports filling of the order to the appropriate MLF branch office. Later the trades recorded on the trading cards are transcribed by a "write-up clerk" and reported to the Comex clearing house, which prepares daily reports of trading activity.

From the foregoing it is clear that the process of filling a customer's order is fraught with potential for mistake. The purpose of the error unit is to minimize the damage caused by these inevitable mistakes. Once MLF becomes aware that an

erroneous trade [1] has occurred, the error is reported to the error desk. The duty of the error unit is to "liquidate" the error as soon as possible by executing an offsetting trade [2] so as to minimize any losses occasioned by the error. These trades are entered in the appropriate error account and "allocated" to the party responsible for the error. Separate error accounts are maintained for errors committed by wire and order personnel, branch office personnel, and floor brokers. If the error results in a loss, half of the loss is deducted from the compensation of the individual responsible for the error. Profits from erroneous trades are kept by MLF. Once an erroneous trade has been liquidated and allocated, it is transferred out of the error accounts. Ideally the process is completed within a day of the error unit's learning of the error.

In December 1983, an investigation by Mr. Texido's office revealed several long-standing unallocated, unliquidated trades in the error account. (Transcript, at 36). The existence of such trades caused concern at MLF, for it not only suggested improper management of the error accounts but exposed MLF to significant financial risk. The risk occurred because the trades, not being liquidated, remained "open." If the market declined, MLF, which owned the trades once they were placed in the error accounts, lost money. (Tr., at 38). By early December the realized and unrealized losses associated with open (unliquidated) positions in the MLF error accounts amounted to approximately $615,000. (Tr., at 38–39).

This brief description of the trading process demonstrates that every trade executed by MLF on customer order leaves a paper trail consisting of the order ticket written up at the branch office and reprinted on the floor of the exchange and the trading card filled out by the floor broker. Investigation by MLF failed to disclose any of these documents corresponding to the open, unallocated trades in the error account. (Tr., at 91). Nor were there any of the memoranda which MLF requires responsible parties to file describing the cause of their errors. (Tr., at 44, 46). Because the trades were unallocated, there was no indication of who caused them. In addition, an interesting pattern emerged: in all or most of these unallocated trades, the "opposite clearing member"—that is, the Comex member which executed the opposite side of these trades—was Prudential-Bache Securities. (Tr., at 46). Further investigation revealed that a particular Prudential-Bache account executive, defendant Miller, executed trades which were equivalent to the opposite side of most of these suspect MLF trades on the days on which the trades occurred. For example, the first such suspect trade, executed on August 25, 1983 and reported on August 26, 1983, was for thirteen contracts to buy December '83 silver at $13.03 per ounce. The opposite clearing member was Prudential-Bache, and Miller's trading records show a trade as of August 25, 1983, to sell thirteen contracts of December '83 silver at $13.03. (Tr., at 62). Similar unallocated trades occurred as of October 6, October 19, October 27, November 28, and November 29. (Tr., at 73, 80–82, 86, 89, 94). Corresponding opposite trades were found in Miller's trading records for all trades except the one occurring as of October 27. (Tr., at 74, 86, 90, 337, 338, 340–343, 344–346). After discovering these open trades MLF closed them out, but intervening changes in the silver market resulted in losses to MLF of $353,000. (Tr., at 105, 219, 241, 242).

MLF's theory is that Miller, Kelly, and Villeroel worked together to execute these

---

1. Typical errors are relatively simple—for example, if a customer wishes to buy December silver but the floor broker buys March silver, or if a customer orders ten·contracts to buy December silver but the floor broker purchases twenty.

2. Just as in stock trading every purchase of stock must be accompanied by a sale, in futures trading every contract to buy must be accompanied by a contract to sell. MLF would offset the errors in the first example in footnote 1 by selling the March silver and in the second example by selling the ten excess contracts.

trades off the floor of the Comex and then to hide them in the error accounts at MLF. In this way, MLF was caused to accept trades it neither ordered nor wanted. According to the complaint, Miller initiated the trades, Kelly forged documents which caused the trade to appear to have been executed on the Comex floor by a floor broker employed by Kelly's employer, and Villeroel accepted the trades on behalf of MLF by placing them in the error accounts. The purpose of the alleged scheme was apparently to permit the three to make trades which had the legal effect of normally-executed trades but which did not require participation in the trading rings. This presumably permitted the three to profit by making trades at prices more favorable than the prices prevailing in the rings at the time the trade was made. Those prices would, of course, have been equally unfavorable to MLF, but this fact was hidden by placing the trades in the error accounts and then shuffling them among the three accounts to avoid detection.

Although none of the defendants has contended that the complaint fails to state a cause of action under the Commodities Exchange Act ("The Act"), the issue is uncertain enough to warrant a brief discussion.

■ The general antifraud provision of the Act forbids "any person" in connection with any contract of sale of any commodity for future delivery ... made ... for or on behalf of any other person ... to cheat or defraud or attempt to cheat or defraud such other person ... or willfully to enter or cause to be entered for such person any false record thereof ... [or] willfully to deceive or attempt to deceive such other

person by any means whatsoever.... 7 U.S.C. § 6b. Section 6b, which applies to futures transactions on domestic exchanges, *First Commodity Corp. v. Commodity Futures Trading Commission,* 676 F.2d 1, 4 (1st Cir.1982), is not an unrestricted prohibition of market fraud. Unlike 17 C.F.R. § 30.02, the CFTC antifraud provision aimed at trading on foreign exchanges, and the SEC's Rule 10b–5, 17 C.F.R. § 240.10b–5, which proscribe securities and commodities fraud practiced by "any person" upon "any person," 7 U.S.C. § 6b applies only to persons making contracts "on behalf of" other persons. *Cf. ACLI International Commodity Services, Inc. v. Banque Populaire Suisse,* 550 F.Supp. 144 (S.D.N.Y.1982) (appeal pending). In other words, the primary focus of the statute is on fraud practiced by brokers on their customers. *See,* R. Nathan and F. Spindel, *"I'm Guilty of What?" Emerging Concepts of Commodities Fraud,* 35 Bus. Lawyer 811, 812 (1980).

■ Nevertheless, it is the plain language of the statute which governs its application. *See, e.g., Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 472, 97 S.Ct. 1292, 1300, 51 L.Ed.2d 480 (1977). The complaint alleges that the defendants conspired to place contracts in MLF accounts—effectively to cause MLF to purchase the contracts—without its knowledge or assent. In so doing, the defendants purported to and did purchase futures contracts "on behalf of" MLF. Their actions thus fit within the statutory language. That MLF was unaware of the purchases on its behalf does not remove these transactions from the ambit of the statute's plain language.[3]

---

**3.** Although MLF has not premised its claim on 7 U.S.C. § 6c, this statute also appears to proscribe the alleged acts. Section 6c(a), under the heading "Meretricious transactions," bars execution of "fictitious sale[s]" and transactions used "to cause any price to be reported, registered, or recorded which is not a true and bona fide price." 7 U.S.C. § 6c(a)(A), (B) (1983). Although the term "fictitious sale" is rather vague, a review of the statutory history reveals that this section was intended generally to prevent collusive trades conducted away from the trading

pits. The fear of Congress was that brokers could unfairly manipulate the terms of trades which were not subjected to prevailing market conditions through trading in the rings. *See* 80 Cong.Rec. 6162, 6163 (1936) (Remarks of Sen. Pope); 80 Cong.Rec. 7865 (1936) (Remarks of Sen. Smith). The Department of Agriculture, the precursor of CFTC in commodities regulation, has held that trades noncompetitively executed away from the ring are "fictitious," *In re Emil Vojtek,* 22 Agric.Dec. 302 (1963), and CFTC

■ In order to have violated the Act, it is not necessary for the defendants to have had an intention affirmatively to injure MLF. It must appear, however, that the deceptive acts were intentional and that the defendants recognized their fraudulent character. *Haltmier v. Commodity Futures Trading Commission*, 554 F.2d 556, 562 (2d Cir.1977); *Commodity Futures Trading Commission v. Savage*, 611 F.2d 270, 283 (9th Cir.1980). Once such a knowing violation of the Act is demonstrated, 7 U.S.C. § 25(a) permits MLF to recover actual damages sustained by reason of the violation.[4] In addition, the Supreme Court found, prior to the 1982 enactment of § 25, an implied private right of action under the Act. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982).

■ Thus, in order to demonstrate a violation of 7 U.S.C. § 6b, MLF need only show that defendants were part of a scheme to execute trades off the floor and to have those trades accepted by MLF without its corporate permission. Such a scheme, regardless of its purpose, involves both entering a false record and attempting to deceive. 7 U.S.C. §§ 6b(B), (C). If knowing, it would constitute a violation of the Act.

■ Judged by this standard, I conclude that MLF has demonstrated a probability of success on the merits. The consistent lack of customer order tickets strongly suggests that trades which were not ordered by MLF customers were nevertheless accepted by someone[5] on behalf of MLF. This in itself was improper. These trades were placed in the error account,

although there is no evidence that they were occasioned by errors. (Tr., at 91). Their failure to be liquidated and allocated further suggests that they were improperly placed in the error account. It is possible that they found their way into these accounts by accident. However, this inference is discouraged by evidence that these trades were shifted from one error account to another, an action which implies knowledge of their impropriety and an attempt to prevent detection of their presence. (Tr., at 102, 103). This combination of factors— the acceptance by someone of trades which were never ordered, their placement in the error accounts, and the failure to disclose them despite actions which clearly suggest knowledge of their presence—suggests that an intentional manipulation occurred. This is further reinforced by the persistent appearance of Prudential—Bache as the opposite clearing member of the trades. Such a pattern appearing by accident is highly improbable.

Thus far, neither Miller nor Kelly is implicated in this intentional scheme. However, Miller's trading records disclose that he nearly always made trades corresponding to the opposite sides of these hidden trades. As defendants have forcefully pointed out, this does not conclusively demonstrate that he initiated or was involved in the illegitimate trades. There is simply no way to determine from the records submitted by MLF whether the trades Miller made were the actual opposite sides of those made by MLF. Further, as Mr. Texido testified, an average of 40,000 contracts are trded on the floor of Comex daily. However, this overwhelming figure in-

---

regulations require all trades to be competitively executed by open outcry or by posting of bids in the trading ring. 17 C.F.R. § 1.38 (1983). If, as is alleged, defendants conspired to trade away from the ring, they violated both 7 U.S.C. § 6c(a)(A) and 17 C.F.R. § 1.38. It is also arguable that a trading price not arrived at through open trading is not a "bona fide" price. Defendants' alleged reporting of such a price to Comex would thus be a violation of § 6c(a)(B).

**4.** I note that the description of 7 U.S.C. § 25(a) as "exclusive" in 7 U.S.C. § 25(a)(2) throws doubt on plaintiff's second cause of action for

common law fraud, but it is unnecessary to reach that question now.

**5.** MLF's theory is, of course, that defendant Villeroel accepted the trades, an assumption apparently based on her position as head of the error unit. Because Villeroel has consented to confirmation I find it unnecessary to determine who acted on behalf of MLF. It is enough that these acts appear to be of the type which would not have been done accidentally or by someone outside MLF.

cludes all quantities of all commodities at all prices by all brokers. Far fewer daily trades were made by Prudential-Bache brokers in, for example, December '83 silver; and the number of daily trades of *thirteen* contracts of December '83 silver at precisely *$13.03* by Prudential-Bache is undoubtedly far fewer yet, considering the range of daily prices and the infinite number of contracts which can be traded at one time. The correlation of Miller and MLF trades on one occasion could have been coincidence. But the persistent appearance of Prudential-Bache on the other side of these poorly documented trades suggests the intentional involvement of someone at Prudential-Bache. And the consistency of Miller's coincident trades—on several days in two commodities at several prices—makes almost inescapable the conclusion that Miller was the person at Prudential-Bache who was participating in these trades. Although it is arguable that a set of conspirators unconnected to Miller simply selected his trades as a basis for their scheme, this seems improbable. Such an inference is further undercut by the evidence that Miller and Kelly knew each other. (Stipulation of April 24, at 4). The evidence of Kelly's involvement is discussed below.

The evidence against Kelly was submitted by stipulation. Kelly was employed as a write-up clerk by Federbush, Semel & Cardello ("FS & C"), a brokerage firm which on frequent occasion serves as floor brokers for MLF trades. Apparently, although no one testified to this directly, one of Kelly's duties was to transcribe daily FS & C trades from the floor brokers' trading cards to the brokerage sheets submitted to the Comex as the official record of FS & C trades. One of Kelly's supervisors at FS & C, Robert Novick, was prepared to testify that Kelly submitted brokerage sheets to Comex which stated that Prudential-Bache sold and MLF purchased thirteen December '83 silver contracts at $13.03 on or about August 26. These trades were purportedly transcribed from the trading cards of James Cahill, a FS & C floor broker, but there is no record of them on Cahill's trading cards. (Stipulation, at 5). Comex records also indicate that Cahill was the floor broker who executed the other Prudential-Bache/MLF transactions discussed above, but his trading cards do not reflect these trades either.[6] (Stipulation, at 5–6). One of these trades, that of October 27, was reported to the Comex on a sheet in Kelly's handwriting. (Stipulation, at 6). Another official of FS & C, Preston Semel, is prepared to testify that Kelly and Miller have both admitted to him that they are acquainted and have had business dealings. (Stipulation, at 4).

The evidence of Kelly's involvement is perhaps less compelling than that against Miller. However, in the absence of evidence that Prudential-Bache and MLF executed more than one trade on August 26 with MLF on the buy side for 13 contracts of December '83 silver at $13.03, it seems likely that Kelly played a role in executing the undocumented August 26 trade in MLF's error account. This impression is supported by the apparently fraudulent manner in which Kelly reported the trade to the Comex. Again, it strains the imagination to suggest that there were two flawed Prudential-Bache/MLF transactions of exactly this quantity of this commodity at this price on the same day. There is little direct evidence that Kelly was involved in the remainder of the trades in question, but the fact that all were apparently fraudulently reported to Comex as having been made by FS & C trader Cahill, Kelly's *modus operandi* for reporting the August trade, persuasively supports the inference that Kelly was involved in these, too. The impression of apparent involvement of Kelly and Miller in this same

---

**6.** At argument counsel challenged the veracity of these assertions, claiming that they contradicted allegations in the complaint. It seems to me, however, that the rather imprecise complaint is more or less consistent with this evidence. Nor do I find FS & C's allegedly substantial business relationship with MLF sufficient reason to suspect perjury or destruction of records. In the absence of any other evidence discrediting Mr. Novick's testimony, I accept it as true, at least for the purpose of the present motions.

scheme is furthered by their admitted acquaintance and past dealings.

 Defendants have emphasized that there is no evidence linking all three alleged conspirators. At this stage, prior to formal discovery, it is not surprising that there is no evidence of direct agreement between any of them, but such evidence is not necessary. Circumstantial evidence of agreement will suffice, *United States v. Carson*, 702 F.2d 351, 361 (2d Cir.), *cert. denied*, —— U.S. ——, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983) (criminal conspiracy), and the agreement may be tacit rather than explicit. *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C.Cir.1983) (civil conspiracy). Nor is it necessary that all members know and agree with one another. It is enough that all conspirators participate in a common scheme knowing of its nature and of the interdependence of its members. *United States v. Barnes*, 604 F.2d 121, 154–155 (2d Cir.1979), *cert. denied*, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980). Success of a scheme such as the one alleged by MLF would require a minimum of three people situated like defendants—someone to place the favorable half of the trade, someone on the floor of the Comex to arrange for the trade to appear to be legitimate,[7] and someone to accept the unfavorable half of the trade on behalf of MLF. While there is no evidence that Miller and an individual at MLF were acquainted—indeed, for her part Villeroel denies knowing him—there is evidence that Kelly and Miller were acquainted (Stipulation, at 4) and that Kelly and Villeroel were acquainted (Villeroel affidavit of April 11, at ¶ 11). Even assuming Villeroel was not involved, Kelly worked near MLF personnel on the floor of the Comex and could easily have been acquainted with many of them. These are the links that must be shown to prove the conspiracy, since as it is alleged it required Miller to contact Kelly and Kelly in turn to contact someone at MLF. Thus it need not be shown that Miller and Villeroel explicitly agreed. Further, the evidence of Kelly's and Miller's activities and the apparent complexity of the scheme convince me that it is probable that MLF will be able to present enough circumstantial evidence to demonstrate that Kelly and Miller conspired with each other and that Kelly conspired with someone at MLF to file false records with the Comex and cheat MLF.[8]

 Substantial amounts of cross-examination were devoted to an attempt by Kelly's counsel to demonstrate that Miller was unlikely to have profited substantially from these purported trades. Counsel succeeded in demonstrating that, at a minimum, it is impossible to discern from the evidence the degree to which these trades benefited any of the defendants. At this stage of the case, MLF's proof on defendants' motives and profits is far from precise. The complaint alleges that margin payments made by MLF to maintain the open positions in its error accounts were somehow funneled into Miller's trading account at Prudential-Bache. The evidence adduced at the hearing, however, failed

7. Plaintiff labels these trades as "fictitious," by which it means, I gather, that they were not ordered by MLF and did not occur in the rings of the Comex. As defendants rightly point out, however, the trades had the effect of "real" trades. The trades were reported in the records of the Comex as having occurred, and they committed MLF to buy and sell many lots of December '83 and March '84 silver at various prices. MLF never attempted to abrogate the contracts. The trades as alleged were thus fictitious in execution but not in effect.

8. The stipulation also contains evidence that Miller and Kelly conspired in February, 1984 to foist upon MLF another trade which it did not order. MLF refused to accept this trade, however, causing great embarrassment to the two defendants, and economic loss to Miller. At argument defendants' counsel insisted that evidence of this transaction was irrelevant—indeed, that it was favorable to their position. I cannot accept the latter proposition. Because of its December investigation, MLF was probably alerted to this type of fraud. Therefore, it is not surprising that the trade was rejected. The conspiracy entered into by Kelly and Miller in February, 1984 constitutes "similar act" evidence, probative of a continuing common scheme or plan, and hence admissible under Rule 404(b), F.R.Evid. Cf. *United States v. Reed*, 639 F.2d 896, 906 (2d Cir.1981).

utterly to support this theory. In fact, it appears that plaintiff's theory is at odds with the working of the Comex. Margin payments are made to the Comex to support open positions, (Tr., at 214, 215), but there is no evidence that these payments are later transferred to the accounts of other investors. MLF's theory seems premised on the notion that once the trade was made Miller retained an ongoing relationship with MLF. Therefore, as the value of MLF's position declined, the value of Miller's necessarily opposite position rose. This is, in their theory, why margin payments would go to Miller. Trading of futures, however, creates no such continuing relationships. Miller could have traded away his futures immediately after obtaining them even though MLF maintained its positions for some time. Even if margin payments were funneled to other investors, there is no guarantee Miller would be the recipient. Thus the motive behind the alleged fraud is not entirely clear.[9] Nevertheless, I find this no bar to confirming these attachments. A defendant's profit is not an essential element of plaintiff's cause of action for the torts of fraud and conspiracy. Plaintiff need only demonstrate that a defendant's wrongful acts caused economic loss to plaintiff.

▮ Defendants questioned the magnitude of the damage calculated by plaintiff; but I find an adequate demonstration of loss, at least for present purposes. Mr. Texido testified that upon discovering the open positions caused by the Prudential-Bache/MLF trades, MLF closed them out by executing opposite trades. Because the market had, in the interim, moved substantially away from the MLF positions, MLF suffered $353,000 in losses on these trades. (Tr., at 241, 242). This is precisely how the losses proximately caused by the type of fraud alleged should be calculated. *Cf. Schultz v. Commodities Futures Trading Commission*, 716 F.2d 136, 139 (2d Cir. 1983) ("[C]ompensation for actual loss is the long-recognized general standard used to measure damages.").

It is alleged that MLF was fraudulently caused to accept and maintain positions it did not want. This calculation sums up the losses caused by the fraudulent establishment and maintenance of these open positions in the error accounts. In the face of such evidence, defendants have not convinced me that MLF was in any way negligent in failing to discover these positions. Indeed, someone apparently shuffled the trades within the error accounts so as to prevent detection. Although defendants may at trial demonstrate that the losses to which Mr. Texido testified cannot or should not be attributed solely to the fraud, they have presented no such evidence thus far. I find that it is probable that plaintiff will prove at trial that it lost $353,000 because of defendants' actions. Since no counterclaims have been filed, this quantity exceeds the amount of presently foreseeable counterclaims.[10] Therefore, the final aspect of the confirmation test is satisfied.

▮ In the face of MLF's satisfaction of the requirements for confirmation, I decline to exercise my discretion to refuse to confirm the orders of attachment as to Kelly and Miller. Kelly and Miller appear to have committed fraud and, given their professions, are probably somewhat sophisticated in managing their assets. In light

---

**9.** That is not to say that there would be no imaginable way for this to be profitable. If the price of December silver, for example, fell during a particular day, defendants could have fraudulently traded late in the day for a "sell" position at the higher price prevailing in the morning. By then immediately trading off this position in a legitimate transaction at the current afternoon (lower) price, defendants could make an immediate profit. The advantage, of course, lies in being able to exercise hindsight and trade at a price different from that prevailing in the ring. The price fraudulently selected,

however, would apparently be limited to one which prevailed at some time during the day. (Tr., at 317–319).

This simply represents one way in which individuals conducting the type of fraud alleged here could exploit the opportunity to their advantage. There is no evidence that defendants actually did this. (Tr., at 321).

**10.** Defendant Miller has threatened counterclaims but gives no hint of their magnitude or substance. Thus I do not consider them.

of this, MLF's decision to use confirmation to secure a New York judgment is at least rational. MLF's pursuit of this particular action has been aggressive but not unfairly so.[11] The orders of attachment as to Kelly and Miller are confirmed.[12]

## II.

The fraud of which defendant Morici is accused in civil action 84 Civ. 2485 also involves manipulation of the error accounts. The operation of the fraud is, however, somewhat more simple than the scheme alleged in 84 Civ. 2406.

Defendant Morici was a floor broker employed by plaintiff. As such, she, like other MLF floor brokers, not only executed trades in the rings for MLF's customers but also traded, with her employer's express permission, for her own account. She differentiated trades accomplished for her own account from those done for customers by marking a "T" on her trading card next to her personal trades. Profits and losses from these trades were credited to and deducted from a trading account she maintained with another company, T & S Commodities. Pursuant to the conditions governing an MLF floor broker's permission to trade for his or her own account, T & S Commodities sent daily reports of Morici's trades to her supervisors at MLF, who scrutinized them.

MLF's theory is that defendant Morici increased the proportion of profitable trades for her own account by assigning certain unprofitable trades which she initially undertook for her own account to the MLF error accounts, causing MLF to take the losses. Morici began trading for her own account in September, 1983. From late September until January 6, 1984, Morici gained between $190,000 and $230,000 by trading for her own account. (Tr., at 136, 291). Of 61 days of such trading, Morici had 57 days which resulted in a net profit and 3 which resulted in a net loss. (Stipulation, at 9). A December 1983 investigation of the floor broker error accounts revealed over 200 trades in the past year for which no forms describing the circumstances under which the errors occurred had been filed. (Tr., at 108). In other words, no broker had assumed responsibility for the mistakes. Of these, 180 were trades which originally appeared on Morici's trading cards and 2 on those of another MLF floor broker. (Tr., at 109). Apparently none could be traced to the remaining six floor brokers, although this was not made clear by the testimony. (Tr., at 108–109). An unstated number of the unallocated transactions transferred from Morici's trading cards to the floor broker error account had originally been marked with a "T" which had been crossed out. All of these latter trades were unprofitable, and because they were placed into the error accounts without being allocated to an individual floor broker MLF was forced to absorb a loss of $88,000. (Stipulation, at 9).

---

**11.** Affidavits indicate that once MLF obtained the temporary restraining order from me it moved quickly to garnish certain Texas assets of Miller. Although this garnishment was obtained *ex parte*, there is nothing before me to indicate that securing it was anything other than a wholly legitimate action under Texas state law.

**12.** Defendant Miller in a post-trial attorney's affidavit raises the issue of proper service. In connection with his employment at Prudential-Bache, Miller signed a consent form which "irrevocably" appointed the administrator of, *inter alia,* the Texas state securities laws as an agent for service of process in actions alleging securities fraud. MLF served process on the Deputy Commissioner of the Texas State Securities Board in a timely fashion. Thus process was timely and properly served.

Defendant attempts to avoid this consent by pointing out that he was fired a few days before the process was served. The consent by *its* terms, however, is irrevocable. It is not conditioned on further employment. In fact, because such fraud is likely to lead to job loss, it would seem to vitiate the intended purpose of the consent to hold that unemployment terminates it. If such service had prevented defendant from receiving adequate notice of this hearing I might have entertained the argument that this style of service was inadequate for an Order to Show Cause, but defendant concedes over two days *actual notice and seems to carefully avoid* stating the date on which he received a copy of the order. Therefore, I can find no prejudice.

Again, I am convinced by this evidence that it is probable that MLF will be able to prove at trial that Morici attempted "to cheat or defraud" them. 7 U.S.C. § 6b(A). Out of the eight floor brokers whose errors flow into the floor broker error account (Tr., at 256), only Morici managed to place into the account a very large number of trades for which there was no explanation. When it is revealed that many of those were originally marked as trades for her personal account and were unprofitable, the clear inference is that Morici was siphoning off unprofitable trades for her own account into the error accounts, where MLF absorbed the losses.[13] This inference is reinforced by Morici's success at trading. Although Mr. Texido testified that profits the size of Morici's were not unusual—a fact that is in itself of little probative value without testimony as to the size of the capital stake used to obtain those profits—he also stated that her consistent good luck was. (Tr., at 263, 353–359). Morici traded for two months straight without a single losing day. It may be true, as Morici told Texido, that she was the best broker on the floor (Tr., at 367), but it also seems likely, in the face of evidence that so many of her unprofitable trades apparently ended up unallocated in the MLF error account, that her startling performance received a substantial and unwitting boost from her unsuspecting employer.[14] It is also fair to assume that Morici knew of and furthered these acts. They were her trades, and she plainly benefitted from their changed designation.

In the face of such evidence, I cannot credit the conclusory denials of wrongdoing which Morici submitted by affidavit. It may be that the explanation here is relatively innocent. Morici may simply have been a careless trader who made frequent errors. It is understandable that fears for her job would cause her to refuse to accept blame. (Stipulation, at 8). However, her consistent luck in her personal trades and the apparent original designation of many losing "errors" as personal trades make it appear that something more calculated occurred. In any event, it seems probable that MLF will so prove.

In addition, I find the stipulated testimony of Robert A. Mann adequate to demonstrate a likelihood that plaintiff will prevail for a judgment above counterclaims of $88,000. Mr. Mann is ready to testify that these are the losses attributable to trades which Morici originally marked with a "T," presumably intending them for her own account, before transferring them to the MLF error accounts. It is proper that she bear the loss. No evidence has been submitted to call this figure into question.[15]

This finding of probability of success on the merits does not, however, end the inquiry. Unlike Kelly and Miller, Morici is a New York resident. MLF cannot rely on N.Y.C.P.L.R. § 6201(1) as a ground for attachment. Instead, it must show that "the defendant, with intent to defraud h[er] creditors or frustrate the enforcement of a judgment ... has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts...." N.Y.C.P.L.R. § 6201(3).

The evidence that Morici has secreted property is rather skimpy. According to an affidavit submitted by Mr. Texido, Morici opened her trading account in September, 1983, on the strength of a $10,000 loan

---

**13.** It is true, as defendant's counsel points out, that certain profitable Morici trades went into MLF's error accounts. However, all of these were accompanied by documentation and allocated to her. The losing trades were not. (Stipulation, at 9–10). In other words, she seems to have been willing to take responsibility for profitable errors but not for unprofitable ones, the losses from which she would be forced to share if the trades resulted from errors or to bear entirely if they were intended for her own account. Thus this evidence cuts against Morici's position more than it supports it.

**14.** Again, the evidence indicates that someone in MLF's error unit was intentionally involved, but it is unnecessary to attempt to decide who.

**15.** The complaint requests damages "in excess of $150,000." No evidence was presented to support this figure, and I have no idea how MLF arrived at it.

from a fellow MLF employee. One week later, she paid back the loan from funds in her trading account. She then proceeded to earn $230,000 in four months of trading. During that time, she consistently drew down the funds in the trading account by cash and check withdrawals, keeping her account balance in the range of $20,000–$50,000. In March, 1984, Texido met with her and asked where the withdrawals went. Morici failed to account for most of the money, although she recalled that she gave $10,000 to her husband for business purposes, paid $30,000 in taxes, and might have purchased a car. Texido claimed that an MLF investigation revealed that Morici invested $46,000 in the purchase of an apartment which is held in someone else's name. It is on the strength of these allegations—particularly the latter, which suggests an attempt to hide funds—that I granted MLF's second application for an order of attachment.

At the hearing, Mr. Texido provided a somewhat different version of the meeting at which Morici's money was discussed. Several MLF employees were present. Morici admitted using the T & S withdrawals for the purposes of paying city and state taxes, buying a Buick, giving her husband money, and buying an apartment to be held in the name of another floor broker. (Tr., at 366–369). Thus the disposition of much of the money in the account was ascertained: $20,000 remains in the account; perhaps $10,000 went for a car; $46,000 went for the apartment; $30,000 paid taxes; and $10,000 went into her husband's business.[16] This totals $116,000, over half of the amount of money which passed through her account.

■■■ Plaintiff bears the burden of proving that Morici has acted to prevent satisfaction of its potential judgment. N.Y.C.P. L.R. § 6223(b). A demonstration of the sale, removal, or disposition of property, without more, is not enough. *Laco X-Ray Systems, Inc. v. Fingerhut*, 88 A.D.2d 425,

453 N.Y.S.2d 757, 760 (1982). The statute requires that such actions be taken with intent to defraud, which cannot be lightly inferred but must be affirmatively proved. *Brastex Corp. v. Allen International, Inc.*, 702 F.2d 326, 331 (2d Cir.1983). Thus, plaintiff must prove the "secreting or disposal of ... particular assets of the [defendant] with intent to defraud [her] creditors." *Eaton Factors Co. v. Double Eagle Corp.*, 17 A.D.2d 135, 232 N.Y.S.2d 901, 903 (1962).

■■■ Plaintiff has demonstrated substantial withdrawals from Morici's trading account, but there is no evidence indicating her motive in doing so. It may be that she simply wanted to invest her substantial profits in other investments or to buy consumer goods, or it may be that she intended to funnel the money into hidden Swiss bank accounts. On the present state of the record I cannot tell. Without some proof of her intent in making the withdrawals, no ground for attachment appears. *Laco X-Ray Systems, supra*, 453 N.Y.S.2d at 760. Nor can I infer fraud from her failure to account wholly for the money to MLF investigators. First, she was under no duty to do so, and the coercive atmosphere which must have prevailed at the meeting could hardly have encouraged her to be forthcoming. Second, she did account for over half of it. It may emerge that the transfer to her husband was made with intent to defraud, but the only evidence in the record indicates that it was intended to support his business. *Maro Hosiery Corp. v. Hann*, 59 A.D.2d 674, 398 N.Y.S.2d 433 (1977) provides an instructive counterpoint. In that case there was evidence of a shift of the title to bank accounts from spouse to spouse. The Appellate Division noted that there was "considerable evidence" that the transfer was made with "actual intent" to defraud creditors. 398 N.Y.S.2d at 434. Here the only evidence of intent indicates a legitimate motive. She freely admitted the apartment purchase, undercutting the im-

---

**16.** There is, of course, no necessary contradiction between this latter claim and her current assertion that her husband is "presently unemployed." Morici Affidavit of April 10, 1984, at ¶ 13.

plication in MLF's original papers that MLF investigators had ferreted this transaction out, and that Morici placed it in another's name to hide her investment. In short, the record is devoid of any evidence that "particular assets" have been transferred or hidden with intent to defraud.[17] MLF's suspicions alone cannot support an attachment; actual evidence is required.

 Finally, I note that attachment is a discretionary remedy. It may be denied even when a plaintiff otherwise satisfies the statutory requirements. *Trigo Hnos., Inc. v. Premium Wholesale Groceries, Inc.*, 424 F.Supp. 1125, 1133 (S.D.N.Y. 1976). Ordinarily the factors to be considered in the exercise of this discretion are those which indicate whether the defendant will be likely to satisfy the potential judgment. It seems to me, however, that the doctrine of clean hands which is traditionally applied to equitable remedies may also play a role here. Attachment, although a creature of statute, is a "harsh" remedy not lightly to be granted, *Brezenoff v. Vasquez*, 107 Misc.2d 197, 433 N.Y.S.2d 553, 554 (Civ.Ct.N.Y.Cty.1980), and a court must exercise care in its application.

Two aspects of MLF's pursuit of this lawsuit concern me. MLF's initial order of attachment was vacated as improvidently granted because MLF's initial averments of fraud were wholly conclusory and thus inadequate to support an attachment. MLF returned for a second time with an affidavit which contained only one arguable instance of fraud, an allegation that Morici had purchased part of an apartment in the name of another. The affidavit implied that an MLF investigation was required to "disclose" this fact. Texido affidavit of April 18, 1984, at ¶ 15. In fact, as was later revealed at the hearing, Morici volunteered this information to MLF. This crucial information, of course, entirely negates the inference of a fraudulent intent. Had it been disclosed in the misleading affida-

vit, I might have denied the application outright. As it was, MLF's careful choice of words caused Morici's assets to be tied up for at least two additional weeks.

In addition, MLF's persistent attempts to seize Morici's assets began before the filing of this lawsuit. At the direction of Bob Romano, an MLF house counsel (not associated with trial counsel), Mr. Texido attempted self-help attachment by phoning an employee of T & S Commodities, the company which held Morici's trading account, and convincing him to freeze the funds in her account. (Tr., 368, 271–272). T & S froze the funds for about a week in March, 1984, before pressure from other floor brokers caused it to reconsider and release the funds. (Tr., 272–281). Since the trading account must have been an important component of Morici's livelihood and MLF had no legal claim on the funds at the time, its motive can only be assumed to have been malicious. The legislature in its wisdom has required that specific conditions be satisfied before one citizen's assets can be seized in a civil dispute by another citizen. MLF, invoking a Wall Street old boy's network, flung down those safeguards and trampled upon them. It hardly sits well for MLF to seek the aid of a court in encumbering Morici's assets only after trying, and for a time succeeding, in doing so by brute force alone. I would be inclined to deny plaintiff's application even if I found the statutory requirements satisfied. In the event, I do not. The motion for confirmation of the attachment as to Morici is denied. The orders of attachment as to her are vacated.

### III.

 Finally, plaintiff has requested leave to commence discovery immediately, to take depositions on three days' notice, and to require production of documents within three days of request. The stated

---

**17.** I do, however, reject defendant's argument that because MLF was not a potential creditor until it filed suit she could not be found to have secreted assets in December. Defendant appears to have been defrauding MLF at that time, and the nature of the fraud suggests she was well aware of it. Thus MLF stood at that time as a foreseeable creditor from whom she might want to hide assets.

ground for the request is plaintiff's fear that defendants are taking steps to hide their assets and cover up their fraud. So far as I can ascertain, defendants Kelly and Miller have not commented on this request, defendant Morici agrees to it if it is reciprocal, and defendant Villeroel apparently opposes it.

It seems to me that sufficient questions have been raised regarding the conduct of all defendants as to justify some type of expedited discovery. However, three days notice for deposition or for production of documents might prove unduly burdensome. Therefore, I grant all parties leave to commence immediate discovery, to take depositions on five days' notice, and to require production of documents within seven days of service of a request.

### IV.

In conclusion, I find that plaintiff Merrill Lynch Futures Inc. has demonstrated a probability that it will prevail on the merits in its securities fraud claims against defendants Kelly, Miller, and Morici. I make no findings as to defendant Villeroel. MLF has demonstrated a probability that it will recover a money judgment above counterclaims of $353,000 against Kelly and Miller in 84 Civ. 2406 and a money judgment above counterclaims of $88,000 against Morici in 84 Civ. 2485.

Because MLF has satisfied the other statutory requirements for attachment of the assets of defendants Miller and Kelly, I grant plaintiff's motion to confirm the order of attachment against their assets. Because MLF has failed to demonstrate a ground for the attachment of the assets of defendant Morici, I deny the motion to confirm the order of attachment against her assets and vacate the orders of attachment issued against her on April 6 and April 18, 1984. Finally, I grant expedited discovery as detailed in Section III of this opinion.

It is SO ORDERED.