**MERRILL LYNCH FUTURES, INC., Plaintiff,**

v.

**J. Mark MILLER, Defendant.**

**No. 84 Civ. 2406 (CSH).**

United States District Court, S.D. New York.

May 6, 1988.

E. Michael Bradley, Brown & Wood, New York City, for plaintiff.

James D. Veach, Mound, Cotton & Wollan, New York City, for defendant.

MEMORANDUM OPINION
AND ORDER

HAIGHT, District Judge:

This is an action brought under the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.,* and state law[1] alleging, *inter alia,* that defendant J. Mark Miller, in conjunction with several others, schemed to defraud plaintiff Merrill Lynch Futures, Inc. ("MLF"). The scheme alleged involved futures trades which I have previously described as "fictitious in execution but not in effect." *Merrill Lynch Futures, Inc. v. Kelly et al.,* 585 F.Supp. 1245, 1254, n. 7 (S.D.N.Y.1984).

The alleged co-conspirators placed trades that appeared on the books of the Commodities Exchange, Inc. ("Comex") as if MLF had either bought or sold silver contracts. Trades which mirrored the "fictitious" MLF trades (i.e. a purchase of a silver contract corresponding to an MLF sale) appeared in Miller's personal account at Prudential–Bache Securities, Inc., where Miller was a broker. One of the alleged co-conspirators, an employee of MLF, placed MLF's trades in its errors account to hide their existence from MLF.

At the outset of the action MLF obtained *ex parte* orders of attachment against the assets of all defendants, the validity of which was extensively litigated before this Court. *See Merrill Lynch Futures, Inc. v. Kelly et al., supra,* (confirming orders of

---

1. Subject matter jurisdiction over the state law claims is based on diversity of citizenship and principles of pendent jurisdiction. *See* Complaint ¶ 6.

attachment against two of three defendants in 84 Civ. 2406, including attachment against Miller).

One of the arguments raised by defendants during the attachment phase of the litigation was whether MLF could demonstrate any damages as a result of the scheme. I discussed this argument in these terms:

> Defendants questioned the magnitude of the damage calculated by plaintiff; but I find an adequate demonstration of loss, at least for present purposes. [An employee of MLF] testified that upon discovering the open positions caused by the Prudential–Bache/MLF trades, MLF closed them out by executing opposite trades. Because the market had, in the interim, moved substantially away from the MLF positions, MLF suffered $353,-000 in losses on these trades ... This is precisely how the losses proximately caused by the type of fraud alleged should be calculated.
>
> It is alleged that MLF was fraudulently caused to accept and maintain positions it did not want. This calculation sums up the losses caused by the fraudulent establishment and maintenance of these open positions in the error accounts. In the face of such evidence, defendants have not convinced me that MLF was in any way negligent in failing to discover these positions. Indeed, someone apparently shuffled the trades within the error accounts so as to prevent detection. Although defendants may at trial demonstrate that the losses ... cannot or should not be attributed solely to fraud, they have presented no such evidence thus far. I find that it is probable that plaintiff will prove at trial that it lost $353,000 because of defendants' actions. Since no counter claims have been filed, this quantity exceeds the amount of presently foreseeable counterclaims.[*]

---

[*] Defendant Miller has threatened counterclaims but gives no hint of their magnitude or substance. Thus I do not consider them.

*Merrill Lynch Futures, Inc. v. Kelly, supra,* 585 F.Supp. at 1255 and n. 10 (citations omitted).

Defendant Miller has, in the interim, asserted several counterclaims. MLF now moves for summary judgment pursuant to F.R.Civ.P. 56 dismissing those counterclaims. Miller cross-moves for summary judgment on the counterclaims.

I.

It is useful first to consider the prevailing standards for the granting or withholding of summary judgment. Whatever misperceptions practitioners in this circuit may have held about the availability of summary judgment in appropriate cases, Chief Judge Feinberg laid them to rest in *Knight v. U.S. Fire Insurance Co.,* 804 F.2d 9, 12 (2d Cir.1986) *cert. denied,* —— U.S. ——, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). Much of the current climate derives from recent Supreme Court decisions. In *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Court focused upon "whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." 106 S.Ct. at 2511. That is a standard, the Court continued, which "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Ibid.* The analogy is particularly appropriate to the case at bar, where extensive pre-trial discovery has generated the testimony of every witness, and the production of every document, that one could reasonably expect to encounter at trial. Accordingly, the inquiry is that posed by *Anderson:* "Whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 2512. *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2555, 91 L.Ed. 2d 265 (1986) (Rule 56 is intended to implement the rights of litigants to demonstrate

prior to trial that claims "have no factual basis").

In *Argus, Inc. v. Eastman Kodak Co.*, 801 F.2d 38 (2d Cir.1986) the Second Circuit cited a third Supreme Court case, *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and other cases in laying down general principles governing summary judgment. The party resisting summary judgment is to be given the benefit of all reasonable doubts in determining whether a genuine issue of material fact exists. However, mere conjecture or speculation by the resisting party does not provide a basis upon which to deny the motion; and that party must do more than simply show that there is some metaphysical doubt as to the material facts. Nor, when the fact of injury is an issue, may the isolated self-serving statements of a plaintiff's corporate officers be regarded as substantial evidence upon which a jury could rely. Finally, the moving party's showing is heightened when the factual context renders the opposing party's claim implausible. In those circumstances, more persuasive evidence than would otherwise be necessary must be adduced to avoid summary judgment. *Argus*, at 801 F.2d 41–42, and cases cited.

With these principles in mind, I turn to consideration of Miller's counterclaims.

## II.

Miller's first counterclaim alleges that MLF defamed him and tortiously interfered with his contractual relationship with Prudential–Bache, causing termination of Miller's employment. These allegations rest on Miller's interpretation of events which preceded termination of his employment as a broker in Prudential–Bache's Houston office. Miller's version of those events is summarized in his Memorandum of Law in Support of his motion:

> Miller alleges that 'sometime before March 22, 1984,' MLF communicated with Pru–Bache and through 'conversations, meetings, discussions or exchange of correspondence' advised Pru–Bache that Miller was engaged in an on-going conspiracy to defraud Merrill Lynch and had wrongfully and unlawfully removed monies through Miller's personal account at 'Prudential–Bache' (Complaint ¶¶ 17, 18).

\*     \*     \*     \*     \*     \*

> The depositions of the various MLF and Prudential–Bache witnesses were punctuated by repeated objections and/or directions not to answer. In addition, MLF has not produced a single document from Merrill Lynch's investigatory file on this matter although this has been the subject of repeated conferences and applications to the Magistrate. Nevertheless, Miller has established that MLF brought Miller's employer to its offices, reviewed the results of its investigation, discussed Miller's involvement in the "scheme" to defraud, and that this in turn led to a perfunctory interview of Miller and his immediate suspension and discharge only days before the complaint was filed.

Memo at 51, 53 (footnote omitted). In support of his motion, Miller has submitted the full transcripts of several depositions taken in this action. He has also summarized that testimony in his Memorandum. The testimony establishes that MLF employees contacted Prudential–Bache in March of 1984 regarding fraudulent trades in its error accounts and relayed its suspicion that Miller was involved.

Miller places particular emphasis on a meeting which took place in March 1984 between several MLF employees and Barbara Salmanson, an attorney with Prudential–Bache responsible for commodities trading matters. The meeting was called by Don Horowitz, an MLF employee, who characterized the purpose of the meeting as "to discuss the problems regarding trading in error accounts of Merrill Lynch by employees of Merrill Lynch and probably employees of Bache." Horwitz Dep. at 53–54.

Another Merrill Lynch employee who attended the meeting, Robert Romano, characterized the purpose of the meeting in these terms:

... the general purpose of the meeting was for Merrill Lynch to alert Prudential–Bache to the fact that it was investigating internally a fraud at Merrill Lynch, one tentacle of which appeared to reach into Prudential–Bache; and we were notifying them of that fact so that they could take steps to protect themselves.

Shortly after this meeting, Salmanson traveled to Houston to meet with Miller and investigate the trades placed in his personal account which mirrored the fraudulent trades in Merrill Lynch's error accounts. During the first meeting between Salmanson and Miller on March 22, 1984, Miller was questioned about a trip he had taken to New York on March 6, 1984. He concedes that he did not respond to that inquiry with complete candor.[2]

Miller has presented no direct evidence in support of his claim that MLF employees accused him of criminal activity and caused Prudential–Bache to fire him. Instead, he argues that reasonable inferences can be drawn about what was communicated in the March meeting between MLF and Salmanson which support his theory. In addition, he presents his own testimony and that of his co-defendants to support his contention that he was not involved in any fraudulent trading scheme.

Miller goes to great lengths in his papers to demonstrate that MLF cannot prove that he was involved in the fraudulent scheme alleged in the complaint. While not conceding the point, counsel for MLF have advised the Court that they intend to withdraw the action against Miller if their motion for summary judgment on his counterclaims is successful. *See* Memorandum in Support, n. 1.

Whether MLF can prove its allegations against Miller is, at this stage of the proceedings, irrelevant. The crucial issue on this motion is whether Miller can prove his allegations, or more precisely whether he can present sufficient evidence in support of his allegations to require determination by a fact finder. In this context, it is useful to recall that mere conjecture or speculation by the resisting party does not provide a basis upon which to deny a motion for summary judgment. *Matsushita Electric Industrial Co. v. Zenith Radio Corp., supra.*

In support of its motion for summary judgment on the first counterclaim, MLF has submitted documentation obtained from Prudential–Bache setting forth its reasons for terminating Miller's employment. MLF has also submitted portions of Miller's own deposition testimony regarding the events which Prudential–Bache claims caused his termination.

The Prudential–Bache documentation submitted by MLF consists of a form routinely completed by security dealers when they have terminated employment of one of their registered representatives. It is called the National Association of Securities Dealers Inc.'s Uniform Termination Notice for Securities Industry Registration, Form U–5. The Form U–5 completed by Prudential–Bache when Miller was terminated states:

> Miller was discharged due to the fact he failed to disclose his involvement in possible improprieties in the trading of his personal account.

Exhibit B, Aff. of Stuart J.M. Breslow.

Miller testified at his deposition that in his initial meeting with Salmanson, he omitted material facts when answering questions about his March 6, 1984 trip to New York.

> Q: Is it not a fact that you told [Salmanson] that you had gone to New York to see [a] young lady?
>
> A: Yes, that's correct.

---

2. Miller traveled to New York on March 6, 1984 to meet Preston Semel and to deliver $90,000 to Semel to cover the losses on a trade. Miller claims that he was not responsible for the trade, but that he complied with Semel's demand for $90,000 because Semel threatened to contact Prudential–Bache and tell them, falsely, that Miller was responsible for the trade. Miller was apparently afraid that Prudential–Bache would believe Semel, and that his continued employment would be jeopardized. Miller Dep. at 151.

At the March 22, 1984 meeting with Salmanson, Miller claimed that his trip to New York was for personal reasons.

Q: Of course, you did not go to New York to see this young lady, did you?

A: I did see that young lady while I was there, and I made an appointment to see her before I went.

I omitted the portions that Preston [Semel] did not want covered.

Q: In short, you lied to [Salmanson]?

A: In short, I omitted a material fact.

Miller Dep. at 184. Miller was suspended on March 22, 1984 after a second interview with Salmanson. He was discharged on March 27, 1984. Miller testified that he owned up to his material omissions at the second meeting:

Q: What happened at that second meeting?

A: She asked me specifically if I sent any monies to Preston Semel, and I said yes.

She asked me if I met with Preston Semel the day I was in New York, and I said yes.

Miller Dep. at 185.

From Miller's own testimony it is evident that he lied to Salmanson during the course of her investigation, and that Salmanson knew he had lied. This was the reason stated on the Form U–5 filed by Prudential–Bache for Miller's termination. Although Miller argues that the professed reason is incredible, he offers no evidence in rebuttal.[3]

■ I am satisfied that MLF is entitled to summary judgment on the first counterclaim. Although Miller has deposed nearly everyone who attended the March meeting between MLF employees and Salmanson, he has presented no evidence that he was defamed in that meeting. Nor has Miller presented any evidence from which a jury could find that he was defamed in any communication by MLF to Prudential–Bache. To the contrary, all evidence submitted on the cross-motions indicates that MLF shared with Prudential–Bache information it had obtained regarding suspicious trades, including the suspicious mirror trades which appeared in Miller's account. While Miller may not appreciate the suspicion cast on his activities by the information thus communicated, he has not shown that he was defamed.

■ Communicating information which leads to suspicion of improper trading does not rise to the level of an accusation of criminal activity. Miller's reliance on New York law to the effect that accusations of criminality are slander *per se* are therefore inapposite. *See Sadowy v. Sony Corp. of America*, 496 F.Supp. 1071, 1077 (S.D.N.Y. 1980) and cases cited therein. Statements which "would tend to injure an individual in his trade, office, occupation, business or profession" are also slanderous *per se. Id.* However, even assuming that Miller has identified statements made by MLF employees that would meet this description, he has not demonstrated that any of MLF's communications were false.

"An assertion that cannot be proved false cannot be held libellous." *Hotchner v. Castillo–Puche*, 551 F.2d 910, 913 (2d Cir.1977). *See also Printers II, Inc. v. Professionals Pub., Inc.*, 615 F.Supp. 767, 773 (S.D.N.Y.1985) (truth is an absolute defense to libel). Since Miller cannot prove that MLF made any false statements to Prudential–Bache, his claim for defamation must fail.[4] Even if MLF is now unable to

---

**3.** Miller contends that Prudential–Bache's professed reason for terminating his employment is not credible because he was a very successful broker highly valued by the firm. He argues that the firm would not part with such a valuable broker for mere dishonesty about trading in a personal account (Miller repeatedly emphasizes that no customer accounts were involved in Salmanson's inquiry) unless pressured to do so by MLF. No evidence has been submitted, however, to support the proposition that Prudential–Bache, or any other brokerage firm, would tolerate dishonesty from any broker regarding suspicious activity in a personal ac-

count. Miller has thus failed to demonstrate that Prudential–Bache's stated reason for terminating his employment was a pretext. *Cf. Meiri v. Dacon*, 759 F.2d 989, 996–997 (2d Cir.1985) (describing plaintiff's burden of demonstrating pretext to rebut employer's evidence of legitimate, non-discriminatory reason for termination in Title VII actions).

**4.** Because I hold that Miller cannot prove the falsity of any of MLF's statements, I need not consider MLF's contention that its communications to Prudential–Bache were privileged. *See Greenfield v. Kanwit*, 546 F.Supp. 220, 227 (S.D.

prove that Miller in fact participated in the scheme, the truthful information communicated to Prudential–Bache (and to the Court in the course of litigation over the orders of attachment) clearly supported reasonable suspicion of Miller's involvement.

■ Miller's claim for tortious interference with his contractual relationship with Prudential–Bache is also unsupported by the evidence. An essential element of a claim for tortious interference with contractual relations is that of causation. A plaintiff must plead and prove that "but for the unlawful actions of defendant, the contract would have been performed." *Demalco, Ltd. v. Feltner,* 588 F.Supp. 1277, 1280 (S.D.N.Y.1984) (Weinfeld, J.).

■ Evidence submitted on the cross-motions provides no support for Miller's contention that MLF caused his termination. Instead, the evidence shows that Prudential–Bache took reasonable action upon learning of the suspicious activity in Miller's account. They did not fire Miller immediately, but instead sent Salmanson, an attorney experienced in commodities trading, to investigate Miller's activities. When Miller was untruthful in the course of the investigation, he was suspended and then terminated.

Miller's dishonesty cannot be said to have been caused by MLF, even though MLF's communications led to the interview with Salmanson which provided Miller the opportunity to be dishonest.

Accordingly, I grant MLF's motion for summary judgment on Miller's first counterclaim.

### III.

Miller's second and third counterclaims allege that he was libelled in an article which appeared in the April 9, 1984 *Wall Street Journal.*[5] The article reads:

#### Merrill Lynch Accuses
#### Ex–Employee, Others
#### Of Defrauding Firm

New York—Merrill Lynch, Pierce, Fenner & Smith, Inc. charged a former employee and two others with defrauding the company by allegedly recording fictitious trades for its futures trading subsidiary.

Rose Villeroel, a clerk with the Merrill Lynch Futures Inc. unit; J. Mark Miller, a broker with Prudential–Bache Securities in Houston; and Robert Kelly, a clerk for Federbush, Semel & Cardello, Inc., a commodity broker, allegedly stole at least $353,550 through the transactions, the complaint said. The three have been fired, according to company spokesmen.

The suit seeks $353,550 in alleged profit made on the fictitious trades and $2 million in punitive damages. A federal judge in New York granted a preliminary injunction barring the defendants from transferring or disposing of any assets and ordered a $353,550 levy imposed on their assets.

The defendants couldn't be reached for comment.

The suit said that the three processed off-setting fictitious orders to buy and sell silver futures contracts on behalf of Merrill Lynch Futures from August 1983 until at least February. Merrill Lynch charges that Mr. Miller's personal account at Prudential–Bache was the trading partner for some of the allegedly fake contracts.

Mr. Kelly allegedly recorded the matched trades on the Comex exchange, and Miss Villeroel allegedly "hid" the transactions by moving them to a Merrill

---

N.Y.1982) (common law privilege protects communications made pursuant to legal or moral duty); *DeSapio v. Kohlmeyer,* 52 A.D.2d 780, 383 N.Y.S.2d 16 (1st Dept.1976) (common law privilege extends to communications by former employer to prospective employer concerning job performance).

**5.** The article was republished by the Futures Industry Association, Inc. in their Bulletin No. 598–84 and, allegedly, by MLF in an in-house news service. Because these republications raise no substantive issues not raised by the initial publication, I do not discuss them separately.

Lynch Futures error account, the complaint said.

The three were charged with engineering the trades so that Merrill Lynch Futures paid margin requirements, which were credited to Mr. Miller's personal account at Prudential–Bache and withdrawn by him.

William Clark, a spokesman for Merrill Lynch, said the "improprieties" were discovered during a continuing internal investigation at Merrill Lynch Futures. He added that Merrill Lynch had contracted regulatory and law enforcement agencies about its investigation.

A threshold question arises concerning which law applies to Miller's claim arising from publication of this article. Miller contends that Texas law should apply, because he lived and worked in Texas at the time of publication and the damage done to his reputation and business occurred primarily in Texas. MLF contends that New York law should apply.

■ Under New York choice of law rules, which apply to this action, *see Sweeney v. Schenectady Union Publishing Co.,* 122 F.2d 288 (2d Cir.1941) *aff'd* 316 U.S. 642, 62 S.Ct. 1031, 86 L.Ed. 1727 (1942), the state with the most significant relationship to the tort alleged in the complaint supplies the governing substantive law. *Nader v. General Motors Corp.,* 25 N.Y.2d 560, 307 N.Y.S.2d 647, 255 N.E.2d 765 (1970); *see also Davis v. Costa–Gavras,* 580 F.Supp. 1082, 1091 (S.D.N.Y.1984). When the tort alleged is libel, the state of plaintiff's domicile at the time of the alleged libel is usually the state with the most significant relationship to the action, since that is where he is presumed to have been most injured. *Davis, supra,* citing Restatement (Second) of Conflict of Laws § 150(2) (1977). However, as Judge Sofaer explained in *Davis:*

This presumptive choice of law does not hold true, however, if 'with respect to the particular issue, some other state has a more significant relationship to the issue or the parties'. (citations omitted)

*Id.,* 580 F.Supp. at 1091

■ In this district, nine factors are considered particularly relevant to choice of law in libel cases involving more than one state. *See Palmisano v. News Syndicate Co., Inc.,* 130 F.Supp. 17, 19 n. 2 (S.D.N.Y. 1955); *Davis, supra.* These factors are:

(1) the state of the plaintiff's domicile;

(2) the state of plaintiff's principle activity to which the alleged defamation relates;

(3) the state where the plaintiff in fact suffered greatest harm;

(4) the state of the publisher's domicile or incorporation;

(5) the state where the defendant's main publishing office is located;

(6) the state of principal circulation;

(7) the state of emanation;

(8) the state where the libel was first seen; and

(9) the law of the forum.

■ Of these factors, only three arguably support application of New York law to this claim. Those factors are: (4) the state of defendant's domicile; (5) the state where the defendant's main office is located; (6) the state of principal circulation.

The complaint reveals that MLF is a Delaware corporation with its principal place of business in New York. No other specific information concerning these factors is contained in the record. Assuming without deciding that New York is MLF's domicile and the state of the allegedly libelous article's principal circulation, each of these factors point to the application of New York law.

Even taken together, however, these factors do not overcome the strong connection between Miller's injury allegedly caused by the article's publication and Texas, the state of Miller's residence. Factors (4) and (5) are in essence identical, and are based on the incidental facts of MLF's corporate identity and office location. Neither of these facts bear any relationship to the alleged libel. Factor (6) would be more persuasive if the publication at issue were of more limited circulation. In fact, I doubt the parties would dispute that the *Wall Street Journal* is widely circulated throughout the country, including Texas.

**1042**

In these circumstances, I hold that Texas law applies to the alleged libel claims arising from publication of the April 9, 1984 article.

Texas law provides a privilege for publication of fair, true, and impartial accounts of "proceedings in a court of justice." Tex. Civ.Prac. & Rem.Code § 73.002 (Vernon 1986).[6] The Court of Appeals of Texas has recently construed this privilege to apply to publication, without malice, of allegations contained in a pleading which is open to the public's inspection as a part of the official court records of the case, regardless of whether the court has yet taken any action on the pleading. *Langston v. Eagle Pub. Co.*, 719 S.W.2d 612 (Tex.App.—Waco 1986).

*Langston* rejected earlier Texas cases which limited the privilege to matters contained in the court record, including pleadings, only after the action had "come up for public hearing or action in open court." *Sutton v. A.H. Belo & Co.*, 64 S.W. 686, 687 (Tex.Civ.App.1901). This limitation was rejected in light of the Supreme Court's holding in *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975) that "the States may not impose sanctions on the publication of truthful information contained in official court records open to public inspection."

■ Texas law also provides that truth of the matters published is an absolute defense to a claim of libel. Tex.Civ.Prac. & Rem.Code § 73.003; *Cranberg v. Consumers Union of U.S. Inc.*, 756 F.2d 382, 388 (5th Cir.1985). A publisher therefore does not need the protection afforded by § 73.002 unless the subject matter published is false. *Cranberg v. Consumers Union of U.S., Inc., supra.*

Application of the privilege accorded accounts of judicial proceedings is a matter of law "when the facts are undisputed and the language used in the publication is not ambiguous." *Levine v. CMP Publications*, 738 F.2d 660, 668 (5th Cir.1984) quoting *Denton Publishing Co. v. Boyd*, 460 S.W.2d 881, 884 (Tex.1970). The facts regarding the publication are not in dispute here, nor is the language used ambiguous in any way. Miller points out that the underlying facts regarding the alleged scheme to defraud MLF are hotly disputed, but that dispute is irrelevant to the matter at hand. The true content of the "judicial proceeding" at issue, i.e. the complaint, is not subject to dispute, nor is the content of the publication.

■ The first seven paragraphs of the article [7] faithfully report the allegations of the complaint in a manner clearly identifying them as allegations. Publication of this information is privileged under § 73.002.

■ The last paragraph, however, is not a report of a judicial proceeding. In that paragraph, a spokesman for MLF is reported to have told the Journal that the "improprieties" were discovered during a continuing internal investigation, and that Merrill Lynch had contacted regulatory and law enforcement agencies about its investigation.

Miller has presented no evidence that suggests this information is in any way untrue. It cannot, therefore, form the basis of an action for libel.

Accordingly, I grant summary judgment to MLF on Miller's second and third counterclaims.

6. This privilege was previously codified in article 5432, Tex.Rev.Civ.Stat.Ann., which was repealed effective September 1, 1985. The parties refer to both art. 5432 and § 73.002 in their papers, without discussing which statute should apply to this action. As I have discovered no substantive difference between the codifications in my research, I do not believe the question bears further analysis.

7. I do not consider the sentence which reads "The defendant's couldn't be reached for comment." That statement is clearly not a report of a judicial proceeding, but it also clearly not "published" by MLF. I assume for the discussion that MLF is, in fact, responsible for communicating the contents of the complaint to the *Wall Street Journal*, although Miller's evidence on the point is less than overwhelming.

## IV.

Miller's fourth and fifth counterclaims purport to state claims for abuse of process and for malicious prosecution.

■ An abuse of process claim requires proof of three elements:

First, there must be regularly issued process, civil or criminal, compelling the performance or forbearance of some prescribed act. Next, the person activating the process must be moved by a purpose to do harm without that which has been traditionally described as economic or social excuse, or justification ... Lastly, defendant must be seeking some collateral advantage or corresponding detriment to the plaintiff which is outside the legitimate ends of the process.

*Kalso Systemet, Inc. v. Jacobs,* 474 F.Supp. 666, 670 (S.D.N.Y.1979) (Weinfeld, J.) quoting *Board of Educ. v. Farmingdale Classroom Teachers Ass'n.,* 38 N.Y. 2d 397, 380 N.Y.S.2d 635, 343 N.E.2d 278 (1975). The essence of the claim is the misuse or perversion of regularly issued process to the accomplishment of an improper purpose.

Miller has failed to identify how MLF has misused regularly issued process in this action. His entire submission on the point consists of this argument:

The evidence in this case ... established (sic) that MLF abused its right to seek orders of attachment and garnishment given the nature of its investigation and the contributory fault if (sic) its own employees. MLF then utilized its Texas garnishment to contact Texas banks and supplied false information to this Court.

Memo at 66–67. The only aspect of this argument which requires comment is that concerning submission of false information to this Court. The false information referred to involved the representation by MLF's counsel that Miller had withdrawn $200,000 from personal accounts at a Texas bank. MLF made this representation in connection with its opposition to Miller's application to have the order of attachment against his Prudential–Bache account partially lifted to permit him to withdraw $5,000 for living expenses and attorneys fees.

In fact, Miller had not made such a sizable withdrawal. The true nature of his transactions with the bank in question were made known within two weeks of MLF's erroneous representations.

■ Despite the error made by MLF, Miller has presented no evidence that MLF's misrepresentations were intentional or malicious. Given the circumstances of the representation, malicious intent cannot reasonably be inferred from the mere fact that incorrect assertions were made. MLF was attempting to dissuade the Court from lifting an already issued order of attachment, an order Miller unsuccessfully resisted. MLF believed itself entitled to compensation from Miller and was zealously seeking, in a lawful manner, to preserve all available assets to that end. MLF's letter containing the misrepresentation suggests that the information was conveyed to them by local Texas counsel. In these circumstances, I find no support for Miller's inference that MLF intentionally lied to the Court.

■ The remainder of Miller's argument on this claim rests on his assertion that MLF's pre-filing investigation should have revealed to them that Miller was not involved in the fraudulent scheme alleged. Since they should have known that Miller was not involved, he reasons, filing an action against him was an abuse of process.

The premise of this argument is extremely tenuous. Miller does not dispute that Kelly, a friend and co-defendant, placed fraudulent trades from the scheme in Miller's personal account. Miller claims this was done without his knowledge or consent. From MLF's perspective, however, the activity in Miller's personal account appeared highly suspicious. Even assuming that MLF should have spotted the fraud earlier than it did, there is no evidence to suggest that MLF knew or should have known that Miller's account was being used in furtherance of the scheme without his consent.

There is thus no evidentiary basis for Miller's claim of abuse of process. Accordingly, I grant MLF's motion for summary judgment on the fourth counterclaim.

 Miller's malicious prosecution claim is premature "for that tort lies only when the judicial proceeding 'begun in malice and without probable cause, ... finally ends in failure.'" *Kelso Systemet Inc. v. Jacobs, supra,* 474 F.Supp. at 670, quoting *Grant v. City of Rochester,* 68 Misc.2d 358, 360, 326 N.Y.S.2d 691, 693 (Sup.Ct.1971). It cannot be asserted as a counterclaim in the very action alleged to be malicious, *The Savage Is Loose Co. v. United Artists,* 413 F.Supp. 555, 562 (S.D.N.Y.1976), even when the plaintiff has announced its intention to withdraw the action.

If Miller wishes to pursue this claim, he must do so after this action is terminated. If he chooses to pursue the claim in a federal court, he must pay close attention to F.R.Civ.P. 11, particularly with respect to allegations of malicious intent.

Accordingly, I grant MLF's motion for summary judgment on Miller's fifth counterclaim.

*Conclusion*

Plaintiff's motion for summary judgment on defendant J. Mark Miller's counterclaims is granted in its entirety.

Consistent with its counsel's representations, *see* p. 1038, *supra,* plaintiff is directed to submit a stipulation of dismissal or an order of dismissal pursuant to F.R.Civ.P. 41 within ten (10) days of the date of this Memorandum Opinion and Order.

The foregoing is So Ordered.